UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                    Plaintiff,

          v.

EDWARD AKEL,

                    Defendant.
_____

REPORT & RECOMMENDATION

15-CR-6005L

### PRELIMINARY STATEMENT

By Order of Hon. David G. Larimer, United States District Judge, dated January

15, 2015, all pretrial matters in the above-captioned case have been referred to this Court

pursuant to 28 U.S.C. §§ 636(B)(1)(A)-(B).  (Docket # 8).

On January 15, 2015, the grand jury returned a five-count indictment against

defendant Edward Akel.  (Docket # 7).  Count One charges Akel with conspiracy to possess with

intent to distribute and to distribute five hundred grams or more of cocaine during the period

2013 through December 9, 2014, in violation of 21 U.S.C. § 846.  Count Two charges him with

possession of cocaine with intent to distribute on December 9, 2014, in violation of 21 U.S.C.

§ 841(a)(1).  Count Three charges Akel with possession of a firearm and ammunition on

December 9, 2014, after having been convicted of a felony, in violation of 18 U.S.C. § 922(g).

The fourth and fifth counts charge him with using and maintaining the premises at 217 Spring

Tree Lane, Greece, New York, and 20 Stone Road, Rochester, New York, respectively, for the

purpose of manufacturing, distributing, and using cocaine, during the period 2013 through

December 9, 2014, in violation of 21 U.S.C. § 856(a)(1).

Currently pending before this Court is a motion filed by Akel seeking to suppress

tangible evidence seized from his residence at 217 Spring Tree Lane and his business at 20 Stone

Road pursuant to search warrants issued on December 8, 2014.[1]  (Docket # 20).  For the reasons

discussed below, I recommend that the district court deny Akel's motion to suppress.


## DISCUSSION

Defendant Edward Akel ("Akel") moves to suppress physical evidence seized

from his residence at 217 Spring Tree Lane in Greece, New York, and his business, World Auto

Sales, 20 Stone Road, Rochester, New York, pursuant to the December 8 warrants.  (*Id.*).  Both

locations were searched, and the evidence seized, pursuant to warrants issued that day by

Monroe County Court Judge Victoria Argento.  Akel maintains that the warrants were

unsupported by probable cause.  (Docket # 20-1 at 3-6).

## The Warrant and Supporting Affidavit

The warrants were issued upon an affidavit sworn to by Martin Logan ("Logan"),

an investigator employed by the Rochester Police Department ("RPD").  (Docket # 20-2).  The

affidavit recounted four controlled purchases of cocaine involving the same confidential

informant (the "CI")[2] and another male, who was not cooperating with the police (the "UM").

Investigator Logan's affidavit asserted that the CI, whom Logan knew personally, had previously

---

[1]  Akel filed omnibus motions seeking other forms of relief.  Specifically, Akel also sought *Brady* material, discovery and inspection, Rule 404(b), 608 and 609 evidence, *Jencks* material, preservation of rough notes, and leave to file additional motions.  (Docket # 20).  Each of the above-referenced motions was decided by the undersigned or resolved by the parties in open court on August 26, 2015.  (Docket ## 22, 23).

[2]  For ease of reference, the CI will be referred to by the male pronoun, although Logan's affidavit does not disclose the informant's gender.

provided reliable information about narcotics trafficking that "ha[d] led to purchases and controlled buys of controlled substances, which ha[d] led to arrests and convictions." (*Id.* at 6). The controlled purchases described in Logan's affidavit occurred in July, September (two) and December. (*Id.* at 5-9).

According to Logan's affidavit, on July 10, 2014, he and another officer met with the CI, searched him to ensure that he had no drugs in his possession, and provided him with $270 in cash. (*Id.* at 5). The CI made a controlled call to the UM, who directed the CI to meet him at a parking lot in Rochester. (*Id.*). The officers conducted surveillance and observed the CI meet the UM at the back of a car that the UM had been driving. (*Id.*). The CI returned to the officers and turned over a baggie of cocaine, which the CI represented he had purchased from the UM for $270 at the rear of the UM's car in the parking lot. (*Id.*).

Some weeks later, on September 19, 2014, Logan and two officers met again with the CI, searched him to confirm he had no drugs in his possession, provided him with $750 in cash, and "formulated a plan to purchase illegal narcotics from an unknown source through [the UM]." (*Id.* at 6). According to Logan's affidavit, the CI made a controlled call to the UM and was directed to pick him up. (*Id.*). The officers conducted surveillance and observed the CI and the UM travel to the vicinity of 20 Stone Road, the location of World Auto Sales, a business purchased by Akel in March 2014. (*Id.* at 6-7). The CI parked "a short distance away," and the UM was observed exiting the CI's car and entering the front door of World Auto Sales. (*Id.* at 6). Shortly thereafter, the officers watched the UM leave the business, return to the CI's car, exit it again, and return to the business, "where he stayed." (*Id.*). The CI then met with Logan and provided him with a baggie of cocaine. (*Id.* at 6-7). The CI explained to Logan that the UM had directed him to drive to a gas station near Stone Road and to "stay there while [the UM] went to

retrieve the cocaine." (*Id.* at 6).  The CI advised Logan that he handed the UM $750, and the

UM handed him the baggie of cocaine when he returned to the CI's car.  (*Id.*).  The UM told the

CI that the UM was going to stay and did not need a ride.  (*Id.*).

On a subsequent date in September, Logan and the officers again met the CI for

the purpose of purchasing drugs from Akel through the UM.  (*Id.* at 7).  The CI was searched to

ensure that he had no drugs and was given $1,500 in cash.  (*Id.*).  The CI called the UM in the

presence of the officers and was again directed to pick up the UM.  (*Id.*).  Surveillance was

conducted, and the officers observed the CI and the UM travel to the vicinity of Akel's home at

217 Spring Tree Lane.  (*Id.*).  The CI parked a short distance from Akel's home, and the officers

watched the UM exit the CI's car and walk to the residence.  (*Id.*).  A white male was observed

in the driveway with the garage door open.  (*Id.*).  The affidavit states that "[a]fter a short time

[the UM] left the location and returned back to the CI vehicle." (*Id.*).  The CI dropped off the

UM and then met with Logan and gave him a bag of cocaine.  (*Id.* at 7-8).  According to the

affidavit, the CI reported the following:

> The CI state[d] that once he/she picked [the UM] up at [ ]
> Avenue[,] he/she was directed to drive to the area of Spring Tree
> Lane, Greece, N.Y.  The CI then handed [the UM] $1500.00 U.S.
> currency official RPD funds.  The CI was then directed to stay
> there while [the UM] went to retrieve the cocaine.  After a short
> time [the UM] returned to the CI and handed him/her one
> sandwich bag containing a white substance resembling cocaine.
> The CI then dropped [the UM] off and returned to [Logan].

(*Id.* at 7).

Logan's affidavit disclosed that in early October he went to World Auto Sales

purporting to be interested in purchasing a car.  (*Id.* at 8).  He was approached by a white male,

who introduced himself as Edward Akel, and gave him a World Auto Sales business card bearing

4

the name Edward Akel.  (*Id.*).  Logan believed that the male that he met was the same person

whom the UM had interacted with the previous month at 217 Spring Tree Lane.  (*Id.*).

According to the affidavit, the final controlled sale occurred in December 2014.

(*Id.*).  As before, the officers met the CI, searched him, gave him buy money (this time, $2,250),

and "formulated a plan to purchase illegal narcotics from Edward Akel at his place of business,

20 Stone Road, Greece, N.Y. through [the UM]."  (*Id.*).  The CI made a controlled call to the UM

and was instructed to pick him up.  (*Id.*).  They were observed to drive to the vicinity of World

Auto Sales, where the CI parked a short distance from the business.  (*Id.*).  The officers

conducting surveillance watched the UM exit the CI's car and enter the front of World Auto

Sales.  (*Id.*).  According to the affidavit, "[a]fter a short time both the [UM] and Edward Akel

were observed by surveillance conversing in the parking lot" of the business, and the UM

thereafter left the business and returned to the CI's vehicle.  (*Id.*).  The CI dropped off the UM

and then met Logan and turned over a bag of cocaine.  (*Id.* at 8-9).  The CI recounted to Logan

that the UM had instructed him to drive to the vicinity of 20 Stone Road, had accepted the

$2,250 from the CI, and had directed the CI "to stay there while [the UM] went to retrieve the

cocaine."  (*Id.* at 8).  The CI told Logan that the UM had returned to his car and had given him

the baggie of cocaine that the CI had surrendered to Logan.  (*Id.*).

In the affidavit, Logan recounted his substantial experience involving

investigation of narcotics trafficking.  (*Id.* at 5).  According to Logan, based upon his training

and experience, as well as his knowledge of the investigation, he believed that narcotics

traffickers frequently maintain records relating to their trafficking activities and that those

records are typically maintained in areas where they will be easily accessible to the traffickers,

including within their residences.  (*Id.* at 9).

Based upon Logan's affidavit, warrants were issued on December 8, 2014, to search Akel's home, his business, and his person.[3]  (Docket # 20-3).  The warrants authorized the officers to search for and seize, among other items, narcotics and books and records reflecting and relating to narcotics trafficking.  (*Id.*).

**Akel's Probable Cause Challenge**

Akel's probable cause challenge rests on three contentions: first, that the supporting affidavit's description of the involvement of the UM is "fatal" to a finding of probable cause; second, that the affidavit discloses no connection between either location and any drug trafficking activity; and, third, that the information provided in the warrant was too "stale" to constitute probable cause.  (Docket # 20-1 at 3-6).  Akel further argues that the *Leon* good-faith exception to the exclusionary rule is inapplicable because the warrants were "based on stale evidence . . . so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."  (*Id.* at 5).

The Fourth Amendment to the Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. CONST. amend. IV; *see also* Fed. R. Crim. P. 41.  In *Illinois v. Gates*, 462 U.S. 213 (1983), the Supreme Court affirmed the "totality of the circumstances" test to determine whether a search warrant satisfies the Fourth Amendment's probable cause requirement.  According to the Court, the issuing judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be

---

[3] Logan's affidavit also sought warrants to search the UM and his car, although warrants authorizing those searches have not been submitted to the Court.  (*See* Docket # 20-2 at 2-3).

found in a particular place." *Illinois v. Gates*, 462 U.S. at 238. A reviewing court's obligation is merely to determine that the issuing judge had a "'substantial basis for...conclud[ing]' that probable cause existed." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Gates*, 462 U.S. at 238-39) (internal quotation omitted); *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) ("a reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate"). Moreover, "resolution of doubtful or marginal cases should be largely determined by the preference to be afforded to warrants." *United States v. Smith*, 9 F.3d at 1012 (citing *Jones v. United States*, 362 U.S. 257, 270 (1960)).

"In determining whether probable cause exists, the magistrate is required to assess whether the information adduced in the application appears to be current, *i.e.*, true at the time of the application, or whether instead it has become stale." *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991). "The doctrine of staleness applies when information proffered in support of a warrant application is so old that it casts doubt on whether the fruits or evidence of a crime will still be found at a particular location." *United States v. Lamb*, 945 F. Supp. 441, 459 (N.D.N.Y. 1996). "While there is no bright line rule for staleness, the facts in an affidavit supporting a search warrant must be sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search and not simply as of some time in the past." *United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993). Accordingly, "[t]he information offered in support of the application for a search warrant is not stale if 'there is sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to be seized are still on the premises.'" *United States v. Lacy*, 119 F.3d 742, 745-46 (9th Cir. 1997) (quoting *United States v. Gann*, 732 F.2d 714, 722 (9th Cir.), *cert. denied*, 469 U.S. 1034 (1984)), *cert. denied*, 523 U.S. 1101 (1998).

"[T]he principal factors in assessing whether or not the supporting facts have become stale are the age of those facts and the nature of the conduct alleged to have violated the law." *United States v. Diaz*, 176 F.3d 52, 109 (2d Cir.) (quoting *United States v. Gallo*, 863 F.2d 185, 192 (2d Cir. 1988), *cert. denied*, 489 U.S. 1083 (1989)), *cert. denied*, 528 U.S. 875 (1999); *United States v. Lamb*, 945 F. Supp. at 460. "Some types of evidence are more likely to remain in one location than other types of evidence." *United States v. Patt*, 2008 WL 2915433, *12 (W.D.N.Y. 2008). In addition, "[w]here the criminal activity is suspected to be ongoing, 'the passage of time between the last described act and the presentation of the application becomes less significant.'" *United States v. Gayle*, 2009 WL 4667093, *3 (S.D.N.Y. 2009) (quoting *United States v. Gallo*, 863 F.2d at 192). Accordingly, "[t]he age of the information is relevant only insofar as it affects the likelihood that evidence will be found at the premises." *See United States v. Zoernack*, 2005 WL 1837962, *2 (S.D.N.Y. 2005).

With respect to Akel's first contention, he argues that "[t]he fact that the [UM] with the CI was never searched for contraband prior to the alleged controlled purchases is fatal to a finding of probable cause . . . [because] it is possible that the [UM] had possession of the alleged contraband prior to coming into contact with the CI or [Akel], and only entered [Akel's] premises . . . in an effort to divert attention from his or her own unlawful activities." (Docket # 20-1 at 3-4). This contention is misplaced. The law imposes no requirement on law enforcement to search all participants to a drug transaction in order to secure a search warrant, and such a requirement would make no sense as applied to non-cooperating participants like the UM in this case. The salient question for the reviewing judge in this case was not whether it was *possible* that the UM had the drugs on his person, but whether it was more *probable* than not that drugs and other specified evidence of drug dealing would be found in Akel's residence and

business premises on December 8, 2014.  Although Akel is correct that it is possible that the UM

himself possessed the drugs that he sold to the CI, the more probable explanation is that he

retrieved them from another person while the CI waited nearby as the UM instructed him to do.

The affidavit further established probable cause to believe that the person the UM met with on

each of the three occasions was Akel.  Thus, I conclude that the affidavit demonstrated sufficient

probable cause to believe that Akel supplied the drugs that the UM sold to the CI in September

and December 2014.

Akel's other contentions present closer questions.  The affidavit is completely

silent as to the locations from which Akel allegedly retrieved the drugs that were sold to the CI.

Not only was the CI not physically present for the interactions between the UM and Akel, but

Logan's affidavit does not even indicate that the UM told the CI anything about his meetings

with Akel.  At most, the affidavit states that the CI was directed to wait some distance from

Akel's residence and business "while [the UM] went to retrieve the cocaine."  (Docket # 20-2 at

6-8).  The affidavit does not reveal whether Akel got the cocaine from his pants pocket, from a

location inside either premises, from a car, from the parking lot or his garage, from another

person, or whether Akel disappeared from UM's sight when he retrieved the cocaine.  Whether

the absence of such information from Logan's affidavit renders insufficient its attempt to

establish probable cause to believe that drugs would be found inside either location is a close

question.  The fact that the quantities of cocaine sold to the CI in the latter two transactions were

not insubstantial ($1,500 worth in September and $2,250 worth in December), when considered

in conjunction with Logan's averment that in his experience narcotics traffickers are likely to

maintain records of their activities, may be sufficient to establish probable cause to believe that

Akel was likely to maintain records relating to his drug dealing in his home and in the business

that he owned.  *See, e.g.*, *United States v. Morgan*, 690 F. Supp. 2d 274, 279, 287 (S.D.N.Y.

2010) (probable cause existed for warrant to search defendant's residence where defendant was

charged with conspiracy to distribute fifty grams or more of crack cocaine and where supporting

affidavit contained agent's statement, based on his experience, that drug traffickers often keep

records related to trafficking activities in their homes).

       Akel's staleness challenge is not without force either.  The warrants were issued

in December, two months after two of the three transactions occurred and two months after the

only transaction on his residential property.  Akel maintains that because of this two month

lapse, the transactions should be disregarded altogether in the evaluation of probable cause.

(Docket # 20-1 at 4-5).  Such an argument is both hypertechnical and illogical.  The question is

whether, taken together, the evidence of Akel's repeated sales is fairly construed as evidence that

he is more than an occasional dealer and is likely to keep on hand in his home and his business

narcotics and narcotics-related records.  The evidence, in my estimation, suggests that he is more

than an episodic dealer: the affidavit recounts that on each of the three occasions the CI called

the UM to arrange a cocaine purchase, the CI was able to obtain the cocaine from Akel without

any evident difficulty, and in increasingly large quantities, within hours of the CI's call to the

UM.  Such evidence reasonably suggests that Akel possessed or had ready access to substantial

quantities of cocaine on a continuing basis.  Whether that reasonable inference is enough to

establish probable cause to believe that drug trafficking evidence would be found at Akel's

residence, where the most recent interaction between the UM and Akel observed by Logan had

occurred two months earlier, as opposed to his business where the December transaction

occurred, is hardly free from doubt; indeed, the conclusion that it is sufficient to establish

probable cause to believe that drugs themselves would be present there two months after the only

transaction on the premises is dubious at best.  Resolution of these close questions is, of course, unnecessary and academic if the executing agents reasonably relied in good faith on the issuing judge's independent determination of probable cause.

## Application of the Good Faith Exception

"Evidence obtained by officers 'in objectively reasonable reliance' on a warrant subsequently invalidated by a reviewing court is not generally subject to exclusion." *United States v. Raymonda*, 780 F.3d 105, 118 (2d Cir.) (citing *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008)), *cert. denied*, 2015 WL 5772963 (2015).  The rationale for this exception to the exclusionary rule is that "there is no conscious violation of the Fourth Amendment, 'and thus nothing to deter'" "[w]hen an officer genuinely believes that he has obtained a valid warrant from a [judge] and executes that warrant in good faith." *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 920-21 (1984)).  That the officer's reliance must be "objectively reasonable" excludes from the reach of the good faith exception those instances in which the application for the warrant "is so lacking in indicia of probable cause as to render reliance upon it unreasonable." *Id.* (quoting *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011).

As the Second Circuit has recognized, this particular exclusion from the good faith exception "most frequently arises when affidavits are bare bones, *i.e.*, totally devoid of factual circumstances to support conclusory allegations." *United States v. Clark*, 638 F.3d at 103.  By contrast, "cases in which a defective warrant issued based on an affidavit providing detailed factual allegations in support of probable cause . . . almost invariably demonstrate reasonable reliance." *Id.*  Indeed, where "thoughtful and competent" judges may disagree over whether the affidavit establishes probable case, the good faith exception carries "particular force." *Id.* at 104.

Logan's affidavit in this case cannot be fairly characterized as bare bones.  It described three separate controlled purchases involving the CI, the UM and Akel.  The affidavit indicated that on each occasion the CI telephoned the UM in Logan's presence to set up the transaction, picked up the UM and drove him directly to the vicinity of Akel's home (on one occasion) and his business (on two occasions).  On the latter two occasions, the affidavit states that the officers and the CI formulated [the] plan to purchase illegal narcotics *from Akel*.  On each occasion, the CI reported to Logan that the UM directed him to wait near Akel's premises while the UM went to retrieve the drugs.  Surveillance agents observed the UM enter Akel's home or business property on each occasion and twice observed him speaking with a person whom they believed to be Akel.  They saw the UM leave the premises shortly after entering and go directly to and enter the CI's car.  The agents observed the CI until he turned over the baggies of cocaine, which he said he had obtained from the UM in return for the buy money.

Although it is theoretically possible that the UM got the cocaine that he provided to the CI from someone other than Akel or someplace other than Akel's home or business, the issuing judge obviously concluded that, on the facts described by Logan and drawing the reasonable inferences from those facts, it was not probable.  Rather, she concluded that it was probable that Akel supplied those drugs and did so from his residential and business premises. The officers cannot be said to have been objectively unreasonable in relying on the issuing judge's determination in this respect.  *See United States v. Jackstadt*, 617 F.2d 12, 14 (2d Cir.) ("[w]e do not find [the agent's] affidavit to be fatally defective because it fails to state explicitly that [defendant] carried the container into the house[;] [t]he [m]agistrate was entitled to make reasonable inferences from the facts stated in the affidavit"), *cert. denied*, 445 U.S. 966 (1980); *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983) ("[t]he magistrate should first

satisfy himself as to the adequacy and reliability of the facts set forth in the application before him[;] . . . [i]t is from these facts *and any reasonable inference to be derived from them* that he determines whether probable cause to issue a warrant is or is not present") (emphasis added).

I further find that the officers' reliance on the warrant for Akel's residence was objectively reasonable despite the fact that the affidavit detailed only one transaction there slightly more than two months earlier.  First, as discussed *supra*, probable cause is determined upon the totality of the circumstances, which, in this case, included two other transactions involving Akel, albeit at his business, the last of which occurred days prior to the warrant.  *See United States v. Pacheco*, 2012 WL 7984422, *3 (W.D.N.Y. 2012) ("[w]here the supporting affidavits present a picture of continuing conduct or an ongoing activity, as contrasted with isolated instances of illegal acts, the passage of time between the last described act and the presentation of the application becomes less significant") (quoting *United States v. Martino*, 664 F.2d 860, 867 (2d Cir. 1981), *cert. denied*, 458 U.S. 1110 (1982)), *report and recommendation adopted*, 2013 WL 1715452 (W.D.N.Y. 2013).  Second, "[n]o hard and fast rule exists to guide law enforcement agents as to when information supporting of a search warrant becomes too stale to provide probable cause in the totality of the circumstances relevant to the assessment of probable cause to search."  *United States v. Ohlson*, 2012 WL 913037, *5 (W.D.N.Y. 2012).  In fact, the instant case illustrates the proposition "that exactly when probable cause becomes [stale] due to the passage of time is a determination upon which reasonable judicial minds can differ." *Id.*  Accordingly, I recommend that the district court apply the good faith exception to the exclusionary rule even if the court finds that the affidavit's recitation of probable cause to search Akel's home was stale.  *See, e.g.*, *United States v. Raymonda*, 780 F.3d at 117, 120 (applying good faith exception to exclusionary rule where warrant was based upon information too stale to

establish probable cause); *United States v. Pacheco*, 2012 WL 7984422 at *4 ("the good faith

exception applies even if it is determined that the underlying warrant lacked probable cause [due

to staleness]"); *United States v. Facen*, 2012 WL 5402490, *2 (W.D.N.Y.) ("even if the search

warrant was unsupported by probable cause [due to staleness], defendants' suppression motion

should be denied because . . . the officers executing the warrant acted in good faith reliance upon

it"), *report and recommendation adopted*, 2012 WL 5401934 (W.D.N.Y. 2012); *United States v.

Gayle*, 2009 WL 4667093, *5 (S.D.N.Y. 2009) ("even if [the issuing judge] erred in issuing the

warrant [because the probable cause was stale], the evidence found during the search should not

be suppressed where the agents conducting the search relied in 'objective good faith' on the

warrant") (quoting *United States v. Leon*, 468 U.S. at 923).


## CONCLUSION

For the reasons stated above, I recommend that the district court deny Akel's

motion to suppress tangible evidence seized from his residence at 217 Spring Tree Lane and his

business at 20 Stone Road pursuant to the search warrants issued on December 8, 2014.  (**Docket

# 20**).


                                                    *s/Marian W. Payson*
                                             MARIAN W. PAYSON
                                             United States Magistrate Judge


Dated:  Rochester, New York
        November 4, 2015

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[4]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
　　　　November 4, 2015

---

[4] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).